19-267-cv(L)
*State of New York v. U.S. Dep't of Justice*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 13th day of July, two thousand twenty.

PRESENT:

ROBERT A. KATZMANN,
 *Chief Judge*,
JOSÉ A. CABRANES,
ROSEMARY S. POOLER,
PETER W. HALL,
DEBRA ANN LIVINGSTON,
DENNY CHIN,
RAYMOND J. LOHIER, JR.,
SUSAN L. CARNEY,
RICHARD J. SULLIVAN,
JOSEPH F. BIANCO,
WILLIAM J. NARDINI,
STEVEN J. MENASHI,
 *Circuit Judges*.

---

STATE OF NEW YORK, STATE OF
CONNECTICUT, STATE OF NEW JERSEY,
STATE OF WASHINGTON,
COMMONWEALTH OF MASSACHUSETTS,
COMMONWEALTH OF VIRGINIA, STATE OF
RHODE ISLAND, CITY OF NEW YORK,

 *Plaintiffs-Appellees*,

v.                                     No. 19-267-cv(L)
                                       No. 19-275-cv(con)

UNITED STATES DEPARTMENT OF JUSTICE, WILLIAM P. BARR, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES,

*Defendants-Appellants.*

| For Plaintiffs-Appellees State of New York, Connecticut, New Jersey, Rhode Island, and Washington, and Commonwealths of Massachusetts and Virginia: | Barbara D. Underwood, Solicitor General, Anisha S. Dasgupta, Deputy Solicitor General, Linda Fang and Ari Savitzky, Assistant Solicitors General, *for* Letitia James, Attorney General of the State of New York, New York, NY. |
|---|---|
| For Plaintiff-Appellee City of New York: | Richard Dearing, Devin Slack, Jamison Davies, *for* James E. Johnson, Corporation Counsel of the City of New York, New York, NY. |

Following disposition of this appeal on February 26, 2020, Plaintiffs-Appellees filed petitions for rehearing *en banc* and an active judge of the Court requested a poll on whether to rehear the case *en banc*. A poll having been conducted and there being no majority favoring *en banc* review, the petitions for rehearing *en banc* are hereby **DENIED**.

José A. Cabranes, *Circuit Judge*, joined by Debra Ann Livingston, Richard J. Sullivan, Joseph F. Bianco, William J. Nardini, and Steven J. Menashi, *Circuit Judges*, concurs by opinion in the denial of rehearing *en banc*.

Raymond J. Lohier, Jr., *Circuit Judge*, joined by Peter W. Hall, *Circuit Judge*, concurs by opinion in the denial of rehearing *en banc*.

Richard J. Sullivan, *Circuit Judge*, joined by José A. Cabranes, Debra Ann Livingston, and Joseph F. Bianco, *Circuit Judges*, concurs by opinion in the denial of rehearing *en banc*.

Robert A. Katzmann, *Chief Judge*, dissents by opinion from the denial of rehearing *en banc*.

Rosemary S. Pooler, *Circuit Judge*, joined by Denny Chin and Susan L. Carney, *Circuit Judges*, dissents by opinion from the denial of rehearing *en banc*.

Michael H. Park, *Circuit Judge*, took no part in the consideration or decision of the petitions.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

JOSÉ A. CABRANES, *Circuit Judge*, joined by DEBRA ANN LIVINGSTON, RICHARD J. SULLIVAN, JOSEPH F. BIANCO, WILLIAM J. NARDINI, and STEVEN J. MENASHI, *Circuit Judges*, concurring in the order denying rehearing *en banc*:

I concur in the order denying rehearing of this case *en banc*.

As a member of the unanimous panel in this case, I begin by observing that the panel opinion expressly underscored the importance of the issues involved in this appeal.[1] And yet, despite the controversy that this subject matter naturally engenders, the fact remains that the core questions on appeal are basic "questions of statutory construction."[2]

In her dissent from the Court's order denying rehearing *en banc*, Judge Pooler characterizes the outcome of this petition for rehearing *en banc* as "[a]stonishing[]"; asserts that she is "frankly, astounded," that the Court did not grant rehearing, particularly in light of the circuit split that now exists; and remarks that the contrary opinions of our sister circuits "call[] into serious question the correctness of our Court's rationale and conclusions."[3] Regardless of the differing opinions of those circuits, our Court's decision to deny rehearing—one made by an *en banc* court consisting of twelve

---

[1]     *See New York v. Dep't of Justice ("DOJ")*, 951 F.3d 84, 90 (2d Cir. 2020) ("Th[is] case implicates several of the most divisive issues confronting our country … national immigration policy, the enforcement of immigration laws, the status of illegal aliens in this country, and the ability of States and localities to adopt policies on such matters contrary to, or at odds with, those of the federal government.").

[2]     *Id*.

[3]     *See post*, Pooler, J., dissenting from denial of rehearing *en banc*, at 1-3.

1

of our Court's thirteen active Circuit Judges—evinces an unmistakable truth: that, in the circumstances presented, reasonable judicial minds can differ as to whether the relevant statutory text permits the Department of Justice to impose the challenged conditions on grants of money to state and municipal law enforcement. There is nothing "astonishing" here about a disagreement among sister circuits, much less anything deserving the castigation by another colleague who asserts that our panel's decision is "wrong, wrong, and wrong again." [4]

Despite the vigor and intensity of Judge Pooler's dissent, she sheds little new substantive light on the debate.[5] Instead, Judge Pooler primarily marshals the

---

[4]     *See post*, Lohier, *J.*, concurring in denial of rehearing *en banc*, at 3. As the only active judge on a panel that includes Senior Judges Ralph K. Winter and Reena Raggi, I offer a sidebar comment in the nature of a point of personal privilege. Judge Lohier's opinion regarding rehearing—a concurrence which is functionally a dissent—is oddly focused on scolding several of his colleagues, comparing their votes in this case to those on prior *en banc* polls. These criticisms, unfounded on the merits, are addressed in the measured concurring opinion of Judge Sullivan, which I join in full. *See post*, Sullivan, *J.*, concurring in denial of rehearing *en banc*, at 1-4.

[5]     Of particular interest is Judge Pooler's silence on the panel opinion's note that Section 1373—the statute requiring cooperation between federal, state, and local law enforcement—need not be found constitutional in all applications in order to be upheld here in the narrow context of federal funding. *See New York v. DOJ*, 951 F.3d at 111-12. As recently reiterated by the Supreme Court, we are to afford a strong presumption "that an unconstitutional provision in a law is severable from the remainder of the law or statute." *Barr v. Am. Ass'n of Political Consultants, Inc.*, --- S. Ct. ----, 2020 WL 3633780, at *8 (2020) (citing *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)); *see also Seila Law LLC v. Consumer Financial Protection Bureau*, --- S. Ct. ----, 2020 WL 3492641 at *20 (2020) (noting that "in the absence of a severability clause, the traditional rule is that the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted" (internal quotation marks omitted)).

arguments of the various opinions of the First, Third, Seventh, and Ninth Circuits upholding injunctions that preclude enforcement of the conditions.[6] All of these opinions, save that of the First Circuit, were available to the panel prior to its issuing its decision. The panel opinion thoroughly addressed all of the reasons relied on by our sister circuits in their decisions rejecting the Department of Justice's position, and explained why, with due respect, it found each of those reasons unpersuasive with respect to the Certification, Notice, and Access Conditions, as well as the claim of unconstitutional commandeering under the Tenth Amendment to the Constitution.[7]

In concurring in the denial of rehearing, I need not restate the host of reasons already explained by Judge Raggi in her comprehensive and careful opinion (in which Judge Winter and I joined in full) as to why, in our view, our sister circuits were in error.[8] It does happen from time to time that our perspective differs from that of other

---

[6]    *See generally City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020); *City of Philadelphia v. Attorney Gen.*, 916 F.3d 276 (3d Cir. 2019); *City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019); *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018).

[7]    *See, e.g.*, *New York v. DOJ*, 951 F.3d at 103 ("We cannot adopt the Seventh or Ninth Circuit's conclusions because we do not think the Attorney General's authority to impose the three challenged conditions here derives from the words 'special conditions' or 'priority purposes.'"); *id.* ("The Third Circuit, however, viewed the Attorney General's statutory authority respecting Byrne Program grants as 'exceptionally limited.' … We do not.").

[8]    Chief Judge Katzmann, in his opinion dissenting from denial of rehearing *en banc*, appears to fault the panel for relying on the phrase "form acceptable to the Attorney General" in Section 10153(a)(5)(D) to conclude that the Attorney General could require compliance certification to be in a form that identifies specific statutes, such as Section 1373. *See post*, Katzmann, *C.J.*, dissenting from denial of rehearing *en banc*, at 4-6. This is perplexing. If the Government invokes a statute as the source of authority for a challenged action, the Court is

3

Circuits. (The opinion of the First Circuit that was issued after our own and offered

disparaging assessments of our panel's efforts deserves a personal "sidebar" comment,

which I offer at the margin in note 9).[9]

---

obliged to construe that statute, regardless of whether the Government's urged construction persuades. *See United States v. Figueroa*, 165 F.3d 111, 114 (2d Cir. 1998) (Sotomayor, *J*.) ("We review issues of statutory construction de novo, and the language of a statute is our starting point in such inquiries." (internal citation omitted)). He also faults the panel for referring to the Attorney General's rulemaking authority, observing that DOJ did not rely on that authority in its brief to this Court, and specifically disavowed such reliance at oral argument in a related case before the Ninth Circuit. *See post*, Katzmann, *C.J.*, dissenting from denial of rehearing *en banc*, at 6-8. As a member of the panel, I offer two responses. First, Judge Raggi's opinion refers to the Attorney General's rulemaking authority in order to reinforce conclusions already reached on other grounds. Does disagreement about such a reference warrant *en banc* review? Second, and in any event, the statutory rulemaking authority applies generally to provisions of the Byrne grant. *See* 34 U.S.C. § 10155. These provisions authorize certain action by the Attorney General with respect to statutory requirements for compliance certification, notice, and access. With respect, I am at a loss to understand how a court can fairly assess the scope of that authority without taking into account that it is informed by a general rulemaking authority.

[9]     The opinion of the First Circuit that Judge Pooler praises for its "apt[] observ[ations]" arguably deserves no direct response, being more notable for its tone than for its persuasive reasoning. A few citations will suffice as a mini-baedeker for the curious. Our construction of the statutory phrase "all other applicable Federal laws," 34 U.S.C. § 10153(a)(5)(D), is derided as "simplistic," *City of Providence*, 954 F.3d at 36; "strain[ing] credulity," *id*. at 37; "extravagant," *id*.; "blind[ly] allegian[t] to the dictionary," *id*.; and, relying on the author's favorite source for authority, "flout[ing] th[e] principle" that "[c]ourts generally ought not to interpret statutes in a way that renders words or phrases either meaningless or superfluous," *id*. at 37 (citing *United States v. Walker*, 665 F.3d 212, 225 (1st Cir. 2011)). Res ipsa loquitur. Meanwhile, the First Circuit makes no mention of the fact that the very definition of "applicable" on which our opinion relies has been employed by the Supreme Court. *See New York v. DOJ*, 951 F.3d at 106 n.21 (citing *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69-70 (2011) (construing provision of Bankruptcy Code)). Much less does it acknowledge that Congress's use of the word "all" in the phrase "*all* other applicable Federal laws" is a powerful signal of its intent to imbue the phrase with its broadest possible meaning. *Id*. at 106 (citing *Norfolk & W Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 128-29 (1991) (explaining that phrase "all other law" is "clear, broad, and unqualified")). It accuses our opinion of "reading the term 'applicable' out of the statute," *City of Providence*, 954 F.3d at 37, while failing even to acknowledge the opinion's argument that "the word 'applicable' does serve a limiting function in the statutory text," *New York v. DOJ*, 951 F.3d at 106. I am, frankly, astounded (as it were), that Judge Pooler applauds as an "apt[]

In the final analysis, the resolution of this dispute will be determined not by arithmetic, but rather, by the strength and persuasiveness of the several decisions. There can be little doubt that, in the fullness of time, the conflict among the Circuits will be resolved by our highest tribunal.

---

observ[ation]" the First Circuit's charge that, in construing 34 U.S.C. § 10153(a)(5)(D), this Court is simply "assuming" a legislative intent having no basis in statutory text or "sound principles of statutory construction." *City of Providence*, 954 F.3d at 36-37.

LOHIER, *Circuit Judge*, joined by HALL, *Circuit Judge*, concurring:

Until today, every single circuit judge to have considered the questions presented by this appeal has resolved them the same way. That's twelve judges—including one former Supreme Court Justice—appointed by six different presidents, sitting in four separate circuits, representing a remarkable array of views and backgrounds, responsible for roughly forty percent of the United States population, who, when asked whether the Attorney General may impose the challenged conditions, have all said the same thing: No.

Undeterred, the panel breaks course in an opinion as novel as it is misguided. As my colleagues explain in their dissent from the denial of rehearing in banc, and as Justice Souter and Judges Selya, Barron, Rendell, Ambro, Scirica, Rovner, Bauer, Manion, Wardlaw, Ikuta, and Bybee have collectively demonstrated, the panel opinion misreads statutory text, misconstrues constitutional doctrine, and mistakes the conclusion that it prefers for the one that the law requires.[1] The task of remedying these very serious errors will now fall to the Supreme Court. I vote against rehearing in banc so that it may do so sooner rather than later. Indeed, if there is a single panel

---

[1] Chief Judge Katzmann aptly describes the opinions of other sister Circuits. See Katzmann, C.J., Dissenting Op. at 2 n.1.

1

decision that the Supreme Court ought to review from this Circuit next Term, it is this one.[2]

Just last year, a number of my colleagues who vote now to deny rehearing in banc reminded us all that "[t]he legitimacy of Congress' power to legislate [via a federal grant program] . . . rests on whether the State voluntarily and knowingly accepts the terms of [that grant program]." N.Y. State Citizens' Coal. for Children v. Poole, 935 F.3d 56, 59 (2d Cir. 2019) (Livingston, J., dissenting from the denial of rehearing in banc) (quotation marks omitted). This limit on the Spending Clause power that they so enthusiastically embraced comes from Pennhurst State School & Hospital v. Halderman, 451 U.S. 1 (1981), in which the Supreme Court required Congress to "speak unambiguously in imposing conditions on federal grant money." New York v. U.S. Dep't of Justice, 951 F.3d 84, 109 (2d Cir. 2020) (emphasis added) (citing Pennhurst). After Pennhurst, the requirement for clarity from Congress in this context is basic and fundamental. And so here the Department urged, the panel concluded, and the principal concurrence in the denial of rehearing in banc now insists that 34 U.S.C. § 10153(a)(5)(D) unambiguously informs States that they must abide by the

---

[2] See Cabranes, J., Concurring Op. at 5 ("There can be little doubt that . . . the conflict among the Circuits will be resolved by our highest tribunal.").

certification condition.  See Brief for Defendants-Appellants at 26–30; New York, 951 F.3d at 110–11; Cabranes, J., Concurring Op. at 1–2.

The problem with this "thrice-asserted view," however, is that it "is wrong, wrong, and wrong again."  Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 80 (2013) (Kagan, J., dissenting).  To start, the panel itself acknowledges that Section 10153(a)(5)(D) "fails to specify precisely [by] which laws" States must abide.  New York, 951 F.3d at 110.  No surprise, then, that States, cities, and municipalities across the country—the very entities whose knowing acceptance is paramount—have agreed with the First Circuit that the panel's interpretation of Section 10153(a)(5)(D) is "extravagant."  Brief for Chicago et al. as Amici Curiae Supporting Plaintiffs-Appellees at 14 (quoting City of Providence v. Barr, 954 F.3d 23, 37 (1st Cir. 2020)).  Sheriffs, police chiefs, and district attorneys have likewise criticized the panel's interpretation as "striking."  Brief for Local Law Enforcement Leaders as Amici Curiae Supporting Plaintiffs-Appellees at 3.  And again, every judge to have considered the certification condition has determined that Section 10153(a)(5)(D) does not permit it.  But these federal judges, States, cities, municipalities, sheriffs, police chiefs, and district attorneys are not just

3

wrong, says the panel, they are unambiguously wrong: there is no room for debate about what Section 10153(a)(5)(D) means.

How does the panel reach such a self-assured conclusion?  It first claims that Section 10153(a)(5)(D) is unambiguous by observing that while it "fails to specify precisely which laws are applicable, that uncertainty can pertain as much for laws applicable to requested grants as for those applicable to grant applicants."  New York, 951 F.3d at 110 (quotation marks omitted).  In other words, multiple ambiguities translate into clarity, two "maybes" mean yes.  But as several of my colleagues in this case and a chorus of others have explained, there is one good reason after another to think that "applicable" in fact means laws applicable to the grant itself, not to grant recipients broadly speaking.  See Pooler, J., Dissenting Op. at 5–6; see also City of Chicago v. Barr, 961 F.3d 882, 898–909 (7th Cir. 2020); City of Providence, 954 F.3d at 36–39; City of Philadelphia v. Attorney Gen., 916 F.3d 276, 288–91 (3d Cir. 2019).

The panel's second interpretive twist is more striking still.  Here, the panel admits that Section 10153(a)(5)(D) may be ambiguous but contends that the Attorney General's identification of 8 U.S.C. § 1373 as an "applicable Federal law" under Section 10153(a)(5)(D) is a permissible "clarifying interpretation[]" of

4

it.  <u>New York</u>, 951 F.3d at 110.  To support that argument, the panel leans heavily on <u>Bennett v. Kentucky Department of Education</u>, 470 U.S. 656 (1985).  But <u>Bennett</u> held that "ambiguities in the requirements [of a federal grant program] should [not] invariably be resolved against the Federal Government as the drafter of the grant agreement."  <u>Id.</u> at 669.  Thus while <u>Bennett</u> remarked that Congress often "[can]not prospectively resolve every possible ambiguity" in a federal grant program, <u>see</u> <u>id.,</u> <u>Bennett</u> did not answer the relevant question before us: whether <u>this</u> ambiguity in Section 10153(a)(5)(D) should give us pause before embracing the Department's position.

Until the challenged conditions were announced in 2016, the Edward Byrne Memorial Justice Assistance Grant Program (the Byrne JAG Program), 34 U.S.C. §§ 10151–10158, had never in its existence conditioned the availability of its funds on the fidelity that localities displayed to federal immigration policies.  Nor did localities appear to use the Byrne JAG Program funds for immigration purposes.  <u>See</u> <u>New York</u>, 951 F.3d at 93.  This is as it should be.  After all, the Byrne JAG Program, spurred by the murder of NYPD Officer Edward Byrne, was designed to aid States and cities in fighting crime, not immigration.  <u>See, e.g.,</u> 34 U.S.C. § 10152(a) (listing the criminal justice purposes toward which Byrne

5

JAG Program funds may be directed); Nathan James, Cong. Research Serv.,

RS22416, Edward Byrne Memorial Justice Assistance Grant Program: Legislative

and Funding History 1–2 (2008) (explaining that the Byrne JAG Program

reflected increased support for state and local law enforcement to respond to

rising crime rates); see also Pooler, J., Dissenting Op. at 2 ("Immigration

enforcement is not identified as an area for which grant funds may be used.  The

statute requires the DOJ to issue Byrne grants pursuant to a formula that

distributes funds based on state and local populations and crime rates.").

The panel opinion, in less than two pages of text, ignores virtually all of

this.  Instead, it concludes that "[k]nowing acceptance is no concern here."  New

York, 951 F.3d at 110 (quotation marks omitted).[3]  Again, several of my

colleagues who vote here to deny rehearing in banc took a different position last

year in Poole.[4]  935 F.3d at 59 (Livingston, J., dissenting from the denial of

---

[3] For substantially the reasons provided by my colleagues dissenting from the decision to deny rehearing in banc, I also agree that the panel decision incorrectly resolved the other statutory interpretation issues before it.  See Pooler, J., Dissenting Op. at 3–11.

[4] Judge Sullivan misunderstands my point about Poole.  In referring to the inconsistency of their opinions, I have not accused him or any of my colleagues of "bad faith or hypocrisy."  Sullivan, J., Concurring Op. at 1.  And the differences Judge Sullivan lists between Poole and this case relate only to policy and result.  None deflects from the Supreme Court's central holding in Pennhurst that Congress must speak unambiguously as to the terms on which it provides funds to States and municipalities.

rehearing in banc) (emphasizing the importance of "whether the State voluntarily and knowingly accepts the terms of" a federal grant program); compare also New York, 951 F.3d at 109 (recognizing "Congress's duty to speak unambiguously in imposing conditions on federal grant money") with Cabranes, J., Concurring Op. at 2 ("[R]easonable judicial minds can differ as to whether the relevant statutory text permits the Department of Justice to impose the challenged conditions on grants of money to state and municipal law enforcement.").

Why has this decision careened so far off the textualist track? How can it be that the language of the statute is both unambiguous and at the same time that reasonable minds could differ about the meaning of the statutory text? Setting aside the policy result of cutting funds to local police forces that refuse to toe the Department line on immigration and that want to focus instead on combatting local crime, what the panel has done here is not an approach that is true to Congress's words or to ordinary principles of statutory construction.

This error creates an important circuit split that needs to be repaired definitively and now.[5]  Unfortunately, the split arises at the end of our Term.  Our already cumbersome process for proceeding in banc, slowed by a pandemic, is not likely to correct anything anytime soon.  And even if we rectified the panel's error, the Department, encouraged by the panel's decision, would continue to peddle its false and contorted theory to the remaining circuits that have yet to debunk it.  Under these circumstances, the better course, in my view, is for the Supreme Court to grant certiorari and reverse.  It can do so faster than we can, and it alone can forestall the spread of this grievous error.

For that reason, and that reason only, I concur in the denial of rehearing in banc.

---

[5] I agree with my colleagues who dissent from the denial of rehearing in banc that this case is of exceptional importance.  See Pooler, J., Dissenting Op. at 3; Katzmann, C.J., Dissenting Op. at 9.  The panel's decision, should it stand, has serious consequences that we should carefully consider.  For example, nothing in the decision stops the Department from conditioning Byrne grants on a State's allegiance to federal environmental laws.

RICHARD J. SULLIVAN, *Circuit Judge*, joined by JOSÉ A. CABRANES, DEBRA ANN LIVINGSTON, and JOSEPH F. BIANCO, *Circuit Judges*, concurring in the order denying rehearing *en banc*:

I concur with the denial of *en banc* review for the reasons set forth in the panel's opinion and in Judge Cabranes's concurrence. I write separately only to address an erroneous and, to my mind, gratuitous point raised in Judge Lohier's concurrence.

The concurrence attacks the panel's opinion (and those who voted to deny rehearing *en banc*) for grafting onto the Byrne Memorial Justice Assistance Grant Program a condition that was not voluntarily and knowingly accepted by the States. In so arguing, the concurrence chides several judges – myself included – for singing a different tune last year when seeking rehearing *en banc* in *New York State Citizens' Coalition for Children v. Poole*, 935 F.3d 56, 59 (2d Cir. 2019) (Livingston, *J.*, dissenting from the denial of rehearing *en banc*). *See ante* at 6–7 (Lohier, *J.*, concurring in the denial of rehearing *en banc*). It suggests that the two cases are somehow indistinguishable, and that a vote to deny *en banc* rehearing here reflects bad faith or hypocrisy on the part of those who sought such rehearing in *Poole*. But as there is very little harmony between this case and *Poole*, a different tune is to be expected.

For starters, the grant condition imposed in *Poole* resulted in a seemingly nonsensical bargain for the States. *Poole* concerned whether, in exchange for partial reimbursement of certain foster care maintenance payments under the Adoption Assistance and Child Welfare Act of 1980, States had agreed to mandatory minimum foster care spending obligations. *Poole*, 935 F.3d at 58–59. Deciding that it had, the majority endorsed a perplexing interpretation of the grant program that New York had knowingly "relinquished to federal courts its longstanding control over discretionary judgments about payment rates for foster care providers in exchange for *partial* reimbursement of *some* expenses incurred in the care of a declining percentage of foster care children." *N.Y. State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 91 (2d Cir. 2019) (Livingston, *J.*, dissenting). And if that were not enough, the majority concluded that Congress intended for this strange deal to be enforceable through private litigation. *Id.* at 92; *see also Poole*, 935 F.3d at 59 (Livingston, *J.*, dissenting from the denial of rehearing *en banc*).

Here, by contrast, the panel's interpretation of the Byrne Grant condition does not result in such a lopsided bargain. In simple terms, States may receive federal funding under the program so long as they do not actively interfere with federal immigration policy, among other things. *See New York v. Dep't of Justice*,

2

951 F.3d 84, 94–96 (2d Cir. 2020). While a State may determine that this is too great a concession – that the juice is not worth the squeeze – that is a decision that States are free to make ex ante based on their assessment of the costs and benefits of the grant program. And, unlike *Poole*, the panel here did not foist an implied cause of action on unwitting grant recipients. Put bluntly, this case is a far cry from *Poole*.

But that's not all; the posture in which the cases arrived before us could not have been more different. In *Poole*, the majority's interpretation imposed "post acceptance or 'retroactive' conditions" on New York, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981), requiring it to make mandatory payments and assume liability that it could not escape, having already accepted federal funds. By contrast, the plaintiffs here challenge a condition of which they received "advance notice" before they applied for federal funding. *New York*, 951 F.3d at 110 ("[P]laintiffs were given advance notice that their 2017 Byrne grant applications had to certify a willingness to comply with § 1373. Indeed, they were given such notice twice, first in 2016, and again in 2017."). In other words, *Poole* required us to determine whether New York knew the rules of the game when it agreed to play; here, the plaintiffs are well aware of the rules – they simply want us to change them before they step onto the court.

3

So, because the panel has not repeated the error permitted in *Poole*, and because the panel's opinion otherwise persuades me that its interpretation of the statute is the correct one, I concur in the denial of rehearing *en banc*.

ROSEMARY S. POOLER, *Circuit Judge,* joined by DENNY CHIN and SUSAN L. CARNEY, *Circuit Judges*, dissenting from the denial of rehearing en banc:

The panel opinion in this case allows the Executive to impose funding conditions on congressionally allocated federal funds in a manner plainly not contemplated by Congress. Astonishingly, given that four other circuits came out the other way, this Court refused to hear this case en banc. I respectfully dissent from the denial of rehearing en banc.

Appellees are states and a city that sought funding from the federal government through the Byrne Memorial Justice Assistance Grants program ("Byrne Grant Program"). The Byrne Grant Program evolved from a 1968 block grant program for law enforcement and criminal justice developed by Congress because "crime is essentially a local problem that must be dealt with by State and local governments." Omnibus Crime Control and Safe Streets Act of 1968 ("1968 Act"), Pub. L. No. 90-351, 82 Stat. 197, 197. In enacting the 1968 Act, Congress intended to "guard against any tendency towards federalization of local police and law enforcement agencies." *Ely v. Verde*, 451 F.2d 1130, 1136 (4th Cir. 1971) (discussing the legislative history of the 1968 Act). It did so by barring federal agencies and Executive Branch employees from using grants administered by the Department of Justice ("DOJ") to "exercise any direction, supervision, or control over any police force or any other law enforcement agency of any State or any political subdivision thereof." § 518(a), 82 Stat. at 208. Despite numerous modifications and amendments to the 1968 Act over the years, that provision remains in effect. *See* 34 U.S.C. § 10228(a).

In 2006, Congress reworked the 1968 Act to create and codify the Byrne Grant Program at issue here, with an eye toward providing state and local governments with "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005); *see also* 34 U.S.C. §§ 10151-58. The statute allows grant

1

recipients discretion to use funds to support activities in any of eight broad criminal justice-related programs. 34 U.S.C. § 10152(a)(1). Immigration enforcement is not identified as an area for which grant funds may be used. The statute requires the DOJ to issue Byrne grants pursuant to a formula that distributes funds based on state and local populations and crime rates. *See* 34 U.S.C. § 10156; *see also City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (noting that "'formula' grants . . . are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula"). So long as they use their funds to satisfy the statute's goals and meet the statute's certification and attestation requirements, state and local governments are entitled to their share of the formula allocation. *See* 34 U.S.C. §§ 10152(a)(1), 10153(A).

In 2017, the DOJ adopted a policy requiring Byrne Grant Program applicants to:

1. Submit a Certification of Compliance with 8 U.S.C. § 1373, a federal law that bars cities or states from restricting communications by their employees with the Department of Homeland Security ("DHS") about the immigration or citizenship status of individuals (the "Certification Condition");

2. Implement a law, policy, or practice that provides DHS officials access to any detention facility to determine the immigration status of those held within (the "Access Condition"); and

3. Implement a law, policy, or practice that ensures correctional facilities will honor any formal written request from the DHS and authorized by the Immigration and Nationality Act seeking advanced notice of the scheduled date and time for a particular alien (the "Notice Condition").

Appellees challenged these conditions by bringing suit in the Southern District of New York. The lower court granted Appellees partial summary judgment, enjoining the DOJ from enforcing the conditions and ordering the release of the 2017 Byrne Grant Program funds. *See New York v. U.S. Dep't of Justice*, 343 F. Supp. 3d 213 (S.D.N.Y. 2018). Our Court reversed this grant of summary judgment, vacated the order to release the funds, and remanded the case. *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 124 (2d Cir. 2020).

2

At the time of the district court's decision, the Seventh Circuit had upheld an injunction precluding enforcement of the Notice and Access Conditions, *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018), *reh'g en banc granted in part on other grounds, vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *reh'g en banc vacated*, Nos. 17-2991, 18-2649, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). Since then, three more of our sister circuits have also upheld injunctions barring enforcement of all or some of the conditions. *See City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020); *City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019); *City of Philadelphia v. Attorney Gen.*, 916 F.3d 276 (3d Cir. 2019).

The circuit split—which generated a host of persuasive opinions from our sister circuits—calls into serious question the correctness of our Court's rationale and conclusions. The opinion in *New York v. U.S. Department of Justice* ignores the words of the statute, the relevant legislative history, and the conclusions of our sister circuits. I am, frankly, astounded that my colleagues did not find this a case of exceptional importance warranting en banc review. *See* Fed. R. App. P. 35(a)(2).

## I.      The DOJ's Statutory Authority to Impose the Challenged Conditions

### A.  The Certification Condition

The Certification Condition requires applicants submit a Certification of Compliance with 8 U.S.C. § 1373, which bars state and local governments from prohibiting or restricting their employees from providing federal officials with information about individuals' citizenship or immigration status. The panel in *New York* concluded that the DOJ was statutorily authorized to impose the Certification Condition based on a statutory provision requiring that a Byrne Grant Program applicant include in its application "[a] certification, made in a form acceptable to the

Attorney General," that "the applicant will comply with all provisions of this part *and all other applicable Federal laws*." 34 U.S.C.§ 10153(a)(5)(D) (emphasis added). Based on the dictionary definition of the word "applicable," the panel determined that an "applicable Federal law" is "one pertaining either to the State or locality seeking a Byrne grant or to the grant being sought." *New York*, 951 F.3d at 106.

That conclusion is in error for a number of reasons. First, the panel's reading of the term "applicable Federal laws" fails to comply with the well-settled principle that statutes should be read so as "to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks and citation omitted); *see also United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992) (noting the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect"); *United States v. Anderson*, 15 F.3d 278, 283 (2d Cir. 1994) ("[C]ourts will avoid statutory interpretations that render provisions superfluous." ). As the Third Circuit explained, an interpretation as expansive as the panel's creates a redundancy issue because if "applicable" is construed to mean laws pertaining to both grants *and* applicants, "all other applicable Federal laws" in effect means "all other Federal laws." *See City of Philadelphia*, 916 F.3d at 289 (internal quotation marks omitted).

The panel argues that its interpretation does not run afoul of the canon against surplusage because "applicable" in fact serves a limiting function; the panel's logic seems to be that the provision is limited because "an applicant must certify its willingness to comply with those laws—beyond those expressly stated in Chapter 34—that can reasonably be deemed 'applicable.'" *New York*, 951 F.3d at 104, 106-07. This is incorrect. As the First Circuit—which issued its opinion after ours—aptly observed:

4

> The Second Circuit's interpretation of the phrase "applicable Federal laws"—which encompasses all federal laws that apply to state and local governments in any capacity—flouts [the] principle [against surplusage] by effectively reading the term "applicable" out of the statute. For instance, a local government can hardly certify that it will comply with a law that does not apply to local governments in the first place. Congress obviously could have written this provision to require Byrne [Grant Program] applicants to certify compliance with "all other Federal laws," but it did not. In our view, the fact that Congress included the word "applicable" strongly implies that the provision must refer to a subset of all federal laws that apply to state and local governments.

*City of Providence*, 954 F.3d at 37.

In addition, while the text of Section 10153(A)(5)(D) does not define "applicable," the statutory context makes clear that "applicable" means applicable to the grant, not the applicant more broadly. *See*, *e.g.*, *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008) ("[T]he term 'applicable' must be examined in context."). The other conditions in Section 10153(A) apply to the grant, not to those who receive the grant. *See*, *e.g.*, 34 U.S.C. § 10153(A)(1) (stating that funds cannot be used to replace state or local funds); *id*. § 10153(A)(2), (3) (mandating that grant projects must be submitted for appropriate review); *id*. § 10153(A)(4) (setting forth a reporting requirement on how the grant is administered); *id*. § 10153(A)(6) (requiring a plan for how grant funds will be used). To read Section 10153(A)(5)(D) as the only condition that applies to states and localities' conduct *beyond* that which is undertaken in their capacities as grant recipients makes little sense. *See Kucana v. Holder*, 558 U.S. 233, 246 (2010) (holding that statutory provisions must be read in context and relying on the other statutory provisions that a particular provision is "sandwiched" between to delineate its scope). There is no reason why Congress would insert a condition unrelated to grant funds into a list that otherwise includes conditions that are closely linked to grant administration. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the

fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."); *see also City of Providence*, 954 F.3d at 37-38 ("It strains credulity to think that Congress would bury among those certifications and assurances an authorization for the DOJ to condition grants on certification of compliance with federal laws that . . . lack any nexus to the Byrne [Grant] program.").

The panel's broad reading of "all other applicable Federal laws" allows the Attorney General to condition the receipt of funds on any number of statutes, such as Section 1373, which have nothing to do with federal grants, and in so doing require applicants to comply with any federal directive, regardless of that directive's relationship with the grant at issue. But as the First Circuit observed, there is ample reason to "doubt that Congress intended to give the DOJ so universal a trump card." *City of Providence*, 954 F.3d at 38. For instance, as the First Circuit notes, the "formulaic nature" of the Byrne Grant Program undermines the notion that "applicable" should be read so expansively. *Id.*

Additionally, Congress reinforced its desire to avoid generally using grant funds to advance policy goals by "stating expressly in other statutes that noncompliance with those statutes' requirements could trigger the withholding of a set percentage of a Byrne [Grant Program] grant." *Id.* at 39. For example, Congress provided that no more than 10 percent of funds may be withheld for failure to meet "death-in-custody" reporting requirements. 34 U.S.C. § 60105(c)(2); *see also id.* § 40914(b)(1) (providing for a withholding of 4 percent of funds for failure to meet background check requirements); *id.* § 20927(a) (providing for a 10 percent reduction for failure to meet sex offender registration requirements); *id.* § 30307(e)(2)(A) (providing for a 5 percent reduction for failure to comply with measures to eliminate prison rape). No more than 5 percent of Byrne Grant Program funds were allowed to be used for

6

discretionary grants, which could be granted only under limited circumstances. *Id.* § 10157(b).

These provisions further demonstrate that Congress did not intend to condition funds on compliance with every law applicable to applicants. "If Congress had already given the Attorney General [the] sweeping authority to withhold all funds for any reason, it would have no need to delineate numerous, specific circumstances under which the Attorney General may withhold limited amounts of funds." *City of Philadelphia*, 916 F.3d at 286. And if Congress were so concerned about state and local authorities flouting federal immigration law, it well knew how to codify that concern and utterly failed to do so here.

Congress in fact considered, on multiple occasions, making compliance with Section 1373 a condition of receiving federal funds—but has never actually done so. *See City of Chicago*, 888 F.3d at 277-78 (collecting bills). The panel's decision notes that enactment of Section 1373 "was informed by Congress's concern that States and localities receiving federal grants were hampering the enforcement of federal immigration laws," *New York*, 951 F.3d at 108, but it hardly follows from this observation that Congress intended to express that policy by conditioning the receipt of Byrne grants on compliance with Section 1373. If that were the case, Congress could have followed through with any one of its attempts to accomplish that goal. This is not the Executive Branch clarifying an ambiguity in a manner that gives effect to congressional intent—this is the Executive Branch sidestepping Congress's refusal to condition grant funds on compliance with Section 1373.

Finally, such a move violates the rule that conditions imposed on the recipients of federal grants are to be "unambiguously" set out by Congress. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Congress is, of course, free to "attach conditions on the receipt of federal funds," and may use that power "to further broad policy objectives by

7

conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (internal quotation marks and citation omitted). But "if Congress desires to condition the States' receipt of federal funds, it must do so unambiguously . . ., enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (internal quotation marks, brackets, and citation omitted).

The panel in *New York v. U.S. Department of Justice* asserts that there is no "knowing acceptance" concern here because the DOJ provided advance notice that the 2017 Byrne Grant Program applications had to certify a willingness to comply with Section 1373. *New York*, 951 F.3d at 110 (internal quotation marks omitted). But the fact that the DOJ "unambiguously" sets out the grant requirements is of no moment, because the conditions are to be set by Congress. Absent Congress writing Section 10153(a)(5)(D) to specify that compliance with every statute and regulation applicable to states and localities acts as a grant condition, Section 10153(a)(5)(D) cannot be read so expansively. To do so would allow the DOJ to exert a tremendous amount of leverage over state and local police authorities and to interfere in an area reserved to the states by imposing new interpretations of federal immigration statutes. *See* U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 Local Solicitation 36-37, 44-45 (2018) (interpreting 8 U.S.C. §§ 1226(a), 1226(c), 1231(a)(4), 1324(a), 1357(a), 1366(1), 1366(3), 1373).

It is true, as the panel points out, that the Supreme Court has recognized that in establishing federal grant programs, Congress cannot always "prospectively resolve every possible ambiguity concerning particular applications of [a program's] requirements." *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985). But reading Section 10153(a)(5)(D) so broadly

8

does not resolve an ambiguity in the statute—it instead reads into the statute a meaning that simply is not there. That is contrary to Congress's intent to create a formula-based program that distributes awards through a "carefully defined calculation" that takes into account just population and crime statistics. *City of Chicago*, 888 F.3d at 285; *see also* 34 U.S.C. § 10156(a)(1) ("[T]he Attorney General shall . . . allocate" funds based on the statutory formula). Allowing the Attorney General to set policy-related conditions "destabilize[s] the formula nature of the grant." *City of Philadelphia*, 916 F.3d at 290; *see also City of Providence*, 954 F.3d at 34 (stating that "it is nose-on-the-face plain that Congress intended [Byrne Grant Program] to operate as a formula grant program").

In sum, there are numerous reasons why the panel erred in holding that "applicable Federal laws" means all laws applicable to states or localities applying for Byrne grants, including Section 1373. Rather, as our sister circuits have concluded, it is apparent that "applicable Federal laws" "are federal laws that apply to state and local governments in their capacities as Byrne [Grant Program] grant recipients." *City of Providence*, 954 F.3d at 38-39. As such, there is no statutory provision authorizing the DOJ's imposition of the Certification Condition.

B.  The Notice and Access Conditions

The panel's rationale for upholding the Notice and Access Conditions is also problematic. The panel determined that these conditions are authorized by the coordination requirement contained in Section 10153(A)(5)(C), which requires grant recipients to certify "in a form acceptable to the Attorney General" that "there has been appropriate coordination with affected [federal] agencies," and the reporting requirement contained in Section 10153(a)(4), which requires the maintenance and reporting of "such data, records, and information

9

(programmatic and financial) as the Attorney General may reasonably require." *See New York*, 951 F.3d at 117-18, 121. The panel explained that the coordination requirement provided statutory authorization because "when a State seeks Byrne funding for programs that relate to the prosecution, incarceration, or release of persons, some of whom will be removable aliens, there must be coordination with the affected federal agency, the Department of Homeland Security [], before a formal application is filed . . . ." *Id.* at 119. Similarly, the panel concluded that the reporting requirement provided statutory authorization for the Notice Condition because the release of information pursuant to this condition is programmatic "at least for Byrne-funded programs that relate in any way to the criminal prosecution, incarceration, or release of persons." *Id.* at 117.

Again, this overly expansive reading of the statute cannot stand. As the Third Circuit thoroughly explained:

> The data-reporting requirement is expressly limited to "programmatic and financial" information—*i.e.*, information regarding the handling of federal funds and the programs to which those funds are directed. It does not cover Department priorities unrelated to the grant program. Furthermore, the coordination requirement asks for a certification that there "has been" appropriate coordination. . . . [W]e interpret [that] to require certification that there *was* appropriate coordination in connection with the grantee's application. This does not serve as a basis to impose an *ongoing* requirement to coordinate on matters unrelated to the use of grant funds.

*City of Philadelphia*, 916 F.3d at 285. It is thus clear from the statutory text that Congress provided authority for the DOJ to mandate only that grant recipients "maintain and report information about its grant and the programs that the grant funds." *City of Providence*, 954 F.3d at 35; *see also City of Los Angeles,* 941 F.3d at 944-45; *City of Philadelphia,* 916 F.3d at 285. In addition, the DOJ is authorized "only to require a certification that the applicant has coordinated

10

in the preparation of its application with agencies affected by the programs for which the applicant seeks funding." *City of Providence*, 954 F.3d at 35; *see also City of Los Angeles,* 941 F.3d at 945; *City of Philadelphia,* 916 F.3d at 285. Yet what the DOJ seeks to require under the Notice and Access Conditions extends far beyond what the reporting and coordination provisions envision.

Rather than properly cabining the DOJ's authority, however, the panel concluded that the DOJ could impose the Access and Notice Conditions for nearly all law enforcement purposes, regardless of whether those purposes relate in any way to the grant. But as discussed above, Congress set out eight programs for which Byrne Grant Program funds may be used, and none is enforcement of federal immigration law. *See* 34 U.S.C. § 10152(a)(1). The statute simply does not support the weight the panel places on it. By permitting the DOJ to stretch its authority beyond its statutory bounds, the *New York* panel invites the Executive Branch to compel states and localities to provide information to, and coordinate with the federal government on, all aspects of law enforcement activity.

For these reasons, the panel's interpretation of the various statutory provisions contained in the Byrne Grant Program statute, as well as its ultimate conclusion that these provisions grant the DOJ authority to impose the Certification, Access, and Notice Conditions, is deeply flawed, and a worthy subject for en banc review.

## II. Whether Section 1373 Violates the Anti-commandeering Doctrine

The panel's treatment of the Tenth Amendment challenge in this case also calls for en banc consideration. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Congress thus has only "the power to

11

regulate individuals, not States." *New York v. United States*, 505 U.S. 144, 166 (1992). This mandate is enforced via the anticommandeering doctrine, which provides that "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).

As the panel noted, this Court previously upheld Section 1373 as constitutional in *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999). There, we concluded that "federal measures that seek to impress state and local governments into the administration of federal programs" violate the Tenth Amendment, but "federal measures that prohibit states from compelling passive resistance to particular federal programs" do not. *Id.* at 35. But the Supreme Court's recent decision in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), calls the viability of *City of New York* into serious question.

In *Murphy*, the Supreme Court invalidated a provision of the federal Professional and Amateur Sports Protection Act ("PASPA"), which prohibited states from allowing sports betting. 138 S. Ct. 1461. In defending the federal law, the DOJ argued that the anti-commandeering doctrine only prohibited the federal government from "affirmatively command[ing]" what the states must do, rather than prohibiting states from enacting certain types of laws. *Id.* at 1478 (internal quotation marks omitted). Thus, the DOJ argued PASPA did not run afoul of the anti-commandeering doctrine because it did not prevent the complete legalization of sports gambling, just those state laws that authorized gambling with restrictions, such as limiting the location where such bets could be made. The Supreme Court rejected this argument:

> The PASPA provision at issue here—prohibiting state authorization of sports gambling—violates the anti-commandeering rule. That provision unequivocally dictates what a state legislature may and may not do. . . . It is as if federal officers were installed in

12

state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals. A more direct affront to state sovereignty is not easy to imagine.

Neither [the sports leagues] nor the United States contends that Congress can compel a State to enact legislation, but they say that prohibiting a State from enacting new laws is another matter. . . .

This distinction is empty. It was a matter of happenstance that the laws challenged in *New York* and *Printz* commanded "affirmative" action as opposed to imposing a prohibition. The basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event.

*Id.* at 1478.

Section 1373 provides in relevant part that:

(a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

8 U.S.C. § 1373.

Just as PASPA did, Section 1373 seeks to skirt the anti-commandeering doctrine's prohibition against coercing states into enforcing federal law. While PASPA sought to accomplish this goal by providing that states could not "sponsor, operate, advertise, promote, license, or authorize by law or compact" sports betting, 28 U.S.C. § 3702(1), Section 1373

13

attempts to do so by stripping from state governments the right to control state officials' communication of information collected for state purposes and at state expense. Just as PASPA barred states from taking certain action (that is, authorizing sports betting), Section 1373 bars states from taking certain action—that is, prohibiting certain communications to federal officials. Thus, our Circuit's previous reliance on the distinction between "measures that seek to impress state and local governments into the administration of federal programs" and "federal measures that prohibit states from compelling passive resistance to particular federal programs" in striking down a Tenth Amendment challenge to Section 1373, *City of New York*, 179 F.3d at 35, is no longer valid in light of *Murphy*. Even the *New York* panel does not seem to challenge this conclusion. 951 F.3d at 113 (noting that "*Murphy* may well have clarified that prohibitions as well as mandates can manifest impermissible commandeering").

Nonetheless, the panel held that the district court erred in concluding that Section 1373 violated the Tenth Amendment because the district court failed to identify a "reserved power States have to enact laws or policies seemingly foreclosed by 8 U.S.C. § 1373." *Id.* at 114. The panel relied heavily on the broad power of the federal government in the immigration context, suggesting that states accordingly lacked power in this arena. *Id.* at 113. But the relevant power reserved to the states in this situation is not the power to enact immigration-related legislation. Rather, the reserved power at issue is the authority of the states to refuse the aid of state officials in enforcing federal law. In failing to engage with this power, the panel erred in its analysis of whether Section 1373 would be facially unconstitutional. *See Printz*, 521 U.S. at 932 n.17, 935 (holding that a statute, which "requires [state employees] to provide information that belongs to the State and is available to them only in their official capacity," violates the Tenth Amendment);

14

*see also id.* at 928 (explaining that the purpose of anti-commandeering doctrine is the "[p]reservation of the States as independent and autonomous political entities").

The panel then went on to conclude that "§ 1373 does not violate the Tenth Amendment *as applied* here to a federal funding requirement." 951 F.3d at 114. It seems the panel concluded that the as-applied challenge fails because Congress has the ability to fix conditions, such as compliance with "applicable Federal laws" as was the case here, on receipt of federal funds. *Id.* at 114-15. But this conclusion makes little sense, in my view. If Section 1373 is a facial violation of the Tenth Amendment, and therefore unconstitutional, then it cannot fall within the scope of "applicable Federal laws," even if the Certification Condition stands. Thus, by relying on the validity of the condition here to suggest that Section 1373 is constitutional as applied, the panel engages in circular reasoning and evades the ultimate issue.

Every other court to have considered the issue post-*Murphy* reached the correct conclusion: Section 1373 violates the Tenth Amendment and is unconstitutional, even as applied to the situation at hand. *See City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 331 (E.D. Pa. 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 872 (N.D. Ill. 2018); *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 953 (N.D. Cal. 2018); *cf. United States v. California*, 314 F. Supp. 3d 1077, 1101 (E.D. Cal. 2018).

For the reasons given above and found in the opinions of our sister circuits, I respectfully dissent from the denial of rehearing en banc. Perhaps the Appellees will find the relief they seek at the Supreme Court.

KATZMANN, *Chief Judge*, dissenting from the denial of rehearing en banc:

I am usually reluctant to vote in favor of rehearing en banc, informed by the institutional experience of our Circuit and the explicit policy of the Federal Rules that en banc rehearing is ordinarily "not favored." Fed. R. App. P. 35(a). That institutional experience is one of general deference to panel adjudication—a deference which holds whether or not the judges of the Court agree with the panel's disposition of the matter before it. Thus, although I disagree with the panel's decision for the reasons stated by Judge Pooler and Judge Lohier, in the vast majority of cases I would have joined those of my colleagues who have voted against rehearing despite such disagreements with the panel's opinion.

Nevertheless, this is a rare case in which I respectfully believe we should have granted rehearing en banc. Judge Pooler and Judge Lohier have described in compelling detail why the panel's statutory analysis was mistaken. I write separately to highlight additionally that the panel did not adhere to the normal rules of appellate litigation to reach this result. In short, the panel reversed the district court's grant of partial summary judgment in favor of Plaintiffs based on legal arguments that Defendants either had not made, had abandoned, or had even expressly disavowed. Few principles are better established in our Circuit

than the rule that "arguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court." *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005); *see Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993). The panel opinion does not explain why a departure from this principle was warranted in this case, and I cannot see why it was.

As Judge Pooler and Judge Lohier each note, most of the substantive statutory issues here have been discussed at length by our sister Circuits, all of which persuasively differ from the panel's interpretations.[1] Those discussions

---

[1]     With respect to the Notice Condition, Judge Ikuta's opinion for the Ninth Circuit, joined by Judge Bybee, demonstrates the deficiency in the panel's conclusion that the provision referring to "programmatic" information authorizes a condition requiring real-time reporting of information unrelated to a program funded by a Byrne JAG grant. *City of Los Angeles v. Barr*, 941 F.3d 931, 944–45 (9th Cir. 2019). So does Judge Selya's opinion for the First Circuit, joined by Justice Souter and Judge Barron, *City of Providence v. Barr*, 954 F.3d 23, 35–36 (1st Cir. 2020), and Judge Rendell's opinion for the Third Circuit, joined by Judges Ambro and Scirica, *City of Philadelphia v. Attorney General of U.S.*, 916 F.3d 276, 285 (3d Cir. 2019).

    The panel's conclusion that the Access Condition is authorized by the statutory language requiring a certification "that there has been appropriate coordination with affected agencies" has been rejected in persuasive discussions by the First, Third, and Ninth Circuits. *See City of Providence*, 954 F.3d at 33 ("The text of the provision itself belies this jerry-built justification."); *City of Los Angeles*, 941 F.3d at 945 (the statutory language neither "support[s] DOJ's interpretation that a recipient must coordinate with DHS agents who are not part of a funded program" nor authorizes the imposition of "an ongoing obligation on the applicant to coordinate with DHS agents throughout the life of the grant"); *City of Philadelphia*, 916 F.3d at 285 (given Congress's choice of verb

illustrate well why the panel was mistaken to conclude that the Byrne JAG statute itself required the challenged conditions. But the panel also concluded that the Byrne JAG statute confers "considerable" discretion upon the Attorney General to set the substantive conditions for a successful grant application beyond those specifically required by the statute. *New York v. Dep't of Justice*, 951 F.3d 84, 103 (2d Cir. 2020); *see id.* at 103 n.18.[2] To reach this conclusion, the panel adopted two novel arguments that set its reasoning further apart from that of the other Circuits: first, that the Attorney General has discretion to impose

---

tense, language requiring certification that there "has been" appropriate coordination "does not serve as a basis to impose an *ongoing* requirement to coordinate on matters unrelated to the use of grant funds").

      Our sister Circuits also cogently disagree with the panel's interpretation of the language "all other applicable federal laws" as authorizing the Certification Condition, *City of Providence*, 954 F.3d at 36–39; *City of Philadelphia*, 916 F.3d at 288–91. Judge Rovner's opinion for the Seventh Circuit, joined by Judge Bauer, further explains why the panel's interpretation of "all other applicable laws" creates serious constitutional problems. *City of Chicago v. Barr*, 961 F.3d 882, 906–08 (7th Cir. 2020) ("Congress, under its spending power, can attach only conditions that "bear some relationship to the purpose of the federal spending," and the universe of *all* federal laws as promoted by the Attorney General would necessarily include many laws that fail to meet that standard[,] . . . rendering the conditions ambiguous."); *see id.* at 933 (Manion, J., concurring in the judgment) (agreeing with and emphasizing this point).

[2]     This aspect of the panel's decision is concerning for the additional reason, helpfully explained by a group of former grant administrators as *amici curiae*, that it transforms the mandatory formula grant program Congress enacted into a discretionary one. *See* Br. of Former Grant Administrators as *Amici Curiae* Supporting Plaintiffs-Appellees and Supporting Rehearing En Banc at 2–12.

substantive conditions on grant recipients under various provisions of the Byrne JAG statute conferring authority over the "form" of an application, and second, that the Attorney General has such discretion under 34 U.S.C. § 10155, the provision conferring general rulemaking authority to carry out the Byrne JAG program. *See New York*, 951 F.3d at 104–05, 116–17, 121–22. Neither argument was properly raised on appeal.

First, the panel holds that several provisions of the Byrne JAG statute, each authorizing the Attorney General to determine the "form" of an applicant's required certifications or assurances, delegates to the Attorney General the authority to fashion conditions on the receipt of Byrne JAG funds not already specified in the Byrne JAG statute. According to the panel, the Attorney General's authority is "evident in the requirement that Byrne grant applicants provide certification in a 'form acceptable to the Attorney General.'" *New York*, 951 F.3d at 105 (quoting 34 U.S.C. § 10513(a)(5)).[3]

---

[3]     In my view, the better interpretation of the statutory text is that Congress delegated authority only over the "form" of the certifications and assurances necessary for a Byrne JAG application, not their content. Without the benefit of adversarial briefing, the panel reached the opposite conclusion on the basis of a single dictionary definition. Relying on that dictionary definition, the panel concludes that the word "form" in this context refers to the document on which an applicant must provide any

4

The panel thought this question worthy of "only brief discussion," characterizing it as "not seriously disputed." 951 F.3d at 104. If that is an accurate description, it is only because Defendants had abandoned the argument the panel adopted. Defendants had argued the point in the district court, *see* Defs.' Mem. of Law at 19, *New York v. Dep't of Justice*, No. 1:18-CV-6474 (ER) (S.D.N.Y. Sept. 14, 2018), ECF No. 51. But the district court reached precisely the opposite conclusion in its well-reasoned opinion. *See New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 230 (S.D.N.Y. 2018). And the State Appellees defended that conclusion in clear terms on appeal. Br. of Appellees State of New York, et al., at 34 ("As the district court explained, the Byrne JAG statute's grant of authority to

---

requested information, and thereby concludes that Congress's choice of the word "form" was in fact meant to confer authority over an application's substance.

Dictionary definitions can be useful in interpreting statutory language, especially when trying to ascertain the meaning of a specialized term, or a term of art, or a word's usage at the time of the law's enactment. But because interpretive challenges often arise from the way a particular word is used in the context of the provision or statute as a whole, dictionaries are often less helpful in addressing them than we might hope. And in some cases "dictionaries must be used as sources of statutory meaning only with great caution." *United States v. Costello*, 666 F.3d 1040, 1043 (7th Cir. 2012) (Posner, J.). That is not only because "[d]ictionary definitions are acontextual," unlike statutory language, *id.* at 1044, but also because dictionary definitions—particularly dictionary definitions of common words—can supply a judge with many possible meanings and no reasoned basis to choose among them. We have referred to Judge Posner's discussion as "helpful cautionary advice," *United States v. Bove*, 888 F.3d 606, 608 n.5 (2d Cir. 2018) (Cabranes, J.), and I think that advice would have been well followed here with respect to the panel's interpretation of the word "form."

the Attorney General to prescribe the *form* of Byrne JAG applications and certifications, *see* 34 U.S.C. § 10153(a), cannot reasonably be construed as authorization to dictate *substantive* eligibility requirements beyond those set forth by Congress."). On appeal, Defendants argue that the *statute itself* makes certification of compliance with Section 1373 a condition of any Byrne JAG application, on the theory that Section 1373 is an "applicable Federal law," but do not argue that the Attorney General has the authority to "identify" Section 1373 as an "applicable" law by virtue of his authority over the "form" of an application, or otherwise has discretion to impose conditions in addition to those imposed by the statute. *See* Br. of Appellants at 26–27. The panel's brief discussion does not mention this history, or explain why it should not lead to the conclusion that Defendants had abandoned this particular argument.

Second, the panel also concluded that the Attorney General possessed additional authority to impose the Notice and Access Conditions pursuant to his authority, codified at 34 U.S.C. § 10155, to "issue rules to carry out" the Byrne JAG program. *See New York*, 951 F.3d at 116–17, 121–22. Whether or not the challenged conditions could be valid exercises of that authority, Defendants did not assert the Attorney General's Section 10155 rulemaking authority as a basis

for the challenged conditions either in the district court or on appeal. *See* Defs.'

Mem. of Law, ECF No. 51; Br. for Appellants. I do not think the panel should

have adopted it under the well-settled principles I have discussed above. *See JP*

*Morgan Chase Bank*, 412 F.3d at 428; *Knipe*, 999 F.2d at 711. Having reached out to

consider this argument, however, the panel should have stopped short again,

because Defendants had already expressly stated to one of our sister Circuits that

the challenged conditions were not promulgated as an exercise of the Attorney

General's Section 10155 rulemaking authority. *See* Oral Arg. at 5:17–5:31, *City &*

*Cty. of San Francisco v. Barr*, No. 18-17308 (9th Cir. Dec. 2, 2019), *available at*

https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000016625.

\* \* \*

For the panel to rely on two legal bases for the challenged conditions that

Defendants have not offered—and in one case, have disavowed—is especially

troubling in the context of this case. As the Seventh Circuit has documented, "the

Attorney General has presented the courts with one statutory 'authorization'

after another for the decision to withhold all Byrne JAG funding from sanctuary

7

cities." *City of Chicago*, 961 F.3d at 920. In my view, there was no reason for the panel to add to that mix two arguments that were never presented to this Court.[4]

Considering only the arguments presented by the parties in this case, I would interpret the Byrne JAG statute as Judge Pooler lays out. If the Attorney General was without discretion (or did not exercise what discretion he has) to impose the challenged conditions, then, as Judge Pooler explains, the challenged conditions can survive a Spending Clause challenge only if the statute imposes them unambiguously. For the reasons explained by Judge Pooler and Judge Lohier, it does not. To be sure, I believe Judge Pooler's reading of the statute is the better one on its own terms, but those who find the statutory language

---

[4] Judge Cabranes downplays the panel's reliance on these two unpreserved arguments as unremarkable or unworthy of en banc review. Ante at 3–4 n.8 (Cabranes, J., concurring in the denial of rehearing en banc). With utmost respect, I disagree. In both cases, the panel read the statute to confer discretion on the Attorney General that the Attorney General either had not claimed, had not exercised, or both. That conclusion was of special significance to this litigation, because if the statute itself was the only basis for the challenged conditions—rather than the Attorney General's exercise of discretion conferred by the statute—then the statute's language must independently live up to the Spending Clause's requirement that conditions on federal funds be "unambiguous[]." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Thus, as Judge Pooler explains, "the fact that the DOJ 'unambiguously' sets out the grant requirements is of no moment, because the conditions are to be set by Congress." Ante at 8 (Pooler, J., dissenting from the denial of rehearing en banc); *see* Br. of Former Grant Administrators as *Amici Curiae* at 2 ("The defining characteristic of a mandatory grant is that Congress, not the agency, determines who receives grant funds and in what amount."). In my view, the statutory analysis set forth by Judge Pooler and the considerations noted in this dissent should have led us to rehear this case en banc.

ambiguous should conclude that the challenged conditions cannot be imposed on Plaintiffs consistent with the Constitution.

As Judge Cabranes has rightly observed, and as Judge Lohier's opinion makes manifest, "the decision not to convene the en banc court does not necessarily mean that a case either lacks significance or was correctly decided. Indeed, the contrary may be true." *United States v. Taylor*, 752 F.3d 254, 256 (2d Cir. 2014) (Cabranes, J., dissenting from the denial of rehearing en banc). For the reasons stated by Judge Pooler and Judge Lohier, I believe the contrary is true here. Indeed, I share my colleagues' view that this case is of exceptional importance, *see* ante at 8 n.5 (Lohier, J., concurring in the denial of rehearing en banc); ante at 3 (Pooler, J., dissenting from the denial of rehearing en banc), a view that Judge Cabranes all but endorses in his concurring opinion, *see* ante at 1 (Cabranes, J., concurring in the denial of rehearing en banc).

All of my participating colleagues also seem to agree that Supreme Court review is now inevitable. *See* ante at 5 (Cabranes, J., concurring in the denial of rehearing en banc); ante at 8 (Lohier, J., concurring in the denial of rehearing en banc); ante at 15 (Pooler, J., dissenting from the denial of rehearing en banc). Of

9

course, that will be for the Supreme Court to decide. Now that our Court has declined to rehear this case, I hope my colleagues are right.

For these reasons, I respectfully dissent from today's order denying rehearing en banc.